UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
GREAT NORTHERN INSURANCE
COMPANY, as a subrogee of
Arunesh Hari and Ranjana Hari,

    Plaintiff,

      - against –

ALBERT LABOZ, M&R CONSTRUCTION
GROUP, INC., and ALBA SERVICES
INC.

    Defendants.

------------------------------X

**MEMORANDUM AND ORDER**

20 Civ. 9168

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Great Northern Insurance Company ("plaintiff") brings this action as the subrogee of two of its policyholders against Albert Laboz, M&R Construction Group, Inc., and Alba Services Inc. after a pipe was broken during a renovation of Laboz's apartment causing extensive damage to the policyholders' apartment. Before the Court are numerous motions and cross-motions for summary judgment. For the following reasons, the Court (1) denies plaintiff's motion against Laboz; (2) grants Laboz's cross-motion against plaintiff; (3) grants Laboz's motion against both Alba and M&R; and (4) grants M&R's motion for conditional summary judgment against Alba.

## BACKGROUND

The following facts, which are undisputed unless otherwise noted, are drawn from (1) plaintiff's Local Civil Rule 56.1 statement ("Pl. 56.1"), ECF No. 83;[1] (2) Laboz's Local Civil Rule 56.1 counterstatement ("Laboz 56.1"), ECF No. 115; (3) M&R's Local Civil Rule 56.1 counterstatement ("M&R 56.1"), ECF No. 104; (4) Alba's Local Civil Rule 56.1 counterstatement ("Alba 56.1"), ECF No. 109; and (5) admissible materials submitted by the parties in connection with their motions.[2]  For purposes of clarity, the Court cites only to plaintiff's 56.1 statement when the facts are not in dispute.

### A.    Factual Background

Plaintiff is an insurance company authorized to issue insurance policies in New York.  Pl. 56.1 ¶ 102.  At all relevant times, plaintiff insured Arunesh and Ranjana Hari (together, the "Haris"), shareholders in the residential cooperative building

---

[1] Plaintiff styles this as a "joint statement" of facts between plaintiff and Laboz, but Laboz filed a Rule 56.1 counterstatement to those facts, ECF No. 115, so we treat the two separately.

[2] The Local Civil Rule 56.1 statement and counterstatements described above are nearly comprehensive, but the Court recognizes that the parties filed several other Rule 56.1 statements and counterstatements.  See, e.g., ECF Nos. 89, 102, 106, 112, 125, 128.  To the extent that the Court relies on these other statements and counterstatements, the Court will note that accordingly.

(the "Co-Op") located at 857 Fifth Avenue, New York, New York 10065.  Id. ¶ 101.[3]

Defendant Albert Laboz ("Laboz") is a New York resident real estate developer who, on June 27, 2017, purchased shares in the Co-Op connected to a unit on the fourth floor above, but not directly above, the Haris' unit.  Id. ¶¶ 1, 30-31.  Defendant M&R Construction ("M&R") is a general contractor, and defendant Alba Services, Inc. ("Alba") is a subcontractor specializing in demolition work.  Id. ¶¶ 41-42.

After purchasing shares in the Co-Op, Laboz planned and undertook a renovation of his unit.  Id. ¶ 6.[4]  To commence the renovation, the Co-Op required Laboz to sign its standard Apartment Alteration Agreement (the "Alteration Agreement"), which Laboz did on June 15, 2018.  Id. ¶ 20, 25; see Declaration of Robert W. Phelan ("Phelan Decl."), ECF No. 82, Ex. 8 (Alteration Agreement).

---

[3] Alba states that it "can neither admit nor deny" numerous background facts, including that it was the demolition subcontractor for the renovation project, because there is no citation to record evidence.  Although we take Alba's point as a technical matter, the accuracy of these very basic facts is apparent on the face of the parties' submissions, including Alba's own motion papers.

[4] M&R disputes this statement, but its objection seems misplaced or even accidental.  M&R 56.1 ¶ 6.  Indeed, M&R clearly accepts that Laboz undertook a renovation of his unit given that M&R admits that it was the general contractor for that project.  Id. ¶ 41.

The Alteration Agreement contains a number of provisions regarding Laboz's potential liability for damage caused by the renovation, including one that required Laboz "to indemnify and hold harmless . . . all other occupants of the building from and against any and all claims, damages, expenses . . . suffered to persons or property as a result of or in any way related to (i) the Work to the Shareholder's Apartment . . . or (iii) the Shareholder's failure to perform the Work in accordance with the approved plans and specifications."  Alteration Agreement § 22; see also id. § 4 ("Acceptance of Responsibility"); id. § 6 ("Damage to Building"); id. § 8 ("Assumption of Risk"); id. Rider 8 ¶ 9 (requiring Laboz to "bear any and all costs for any plumbing leaks or other conditions which cause damage to . . . other apartments in the building"); id. Ex. D (agreeing to indemnify shareholders or occupants of the apartments that are adjacent to and immediately above and below Laboz's unit).

However, the final section of the Alteration Agreement titled "No Third-Party Beneficiaries" makes clear: "No person or entity not a party to this Agreement, including any other shareholder in the Corporation shall be deemed a third-party beneficiary hereunder nor, in pursuing any claims against the Shareholder or the Corporation that are parties to the Apartment Alteration

-4-

Agreement, shall this Agreement form the basis for any claim by any person or entity not a party to this Agreement." Id. § 45.

Laboz hired M&R as the general contractor for the renovation project after having used M&R for several projects in connection with his business as a real estate developer and having no issues with their performance.  Pl. 56.1 ¶ 41; Phelan Decl., Ex. 33 ("Laboz Dep.") 15:2-17:21.   On June 14, 2018, Laboz and M&R formalized the arrangement and executed an indemnification agreement (the "Laboz-M&R Indemnification Agreement") that provides:

> To the fullest extent permitted by law, the contractor [M&R] shall indemnify, defend, and hold harmless the Owner [Laboz] and employee of either of them from and against claims, damages, losses and expenses . . . arising out of or resulting from performance of the contractor's Work, provided that such claim, damage, loss or expense is attributable to . . . destruction of tangible property (other than the Work itself), including loss of use resulting therefrom, cause[d] in whole or in part by negligent acts or omissions of the contractor, the contractor's Sub-contractors, anyone directly or indirectly employed by them or anyone for whose act they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder.

Phelan Decl., Ex. 10 (Laboz-M&R Indemnification Agreement) § 1.1.[5]

---

[5] Pursuant to the Agreement, M&R agreed to purchase and maintain insurance in the amounts required under the Alteration Agreement.  Laboz-M&R Indemnification Agreement § 2.1.  M&R subsequently provided a certificate of such insurance.  Phelan Decl., Ex. 34; Pl. 56.1 ¶ 52.

In turn, M&R hired Alba as the demolition subcontractor based on the recommendation of the Co-Op's superintendent Thomas McGurl ("Superintendent McGurl"), who testified that Alba had previously worked in the Co-Op and that he had a "[f]airly good experience" working with them.[6]  Phelan Decl., Ex. 32 ("McGurl Dep.") 68:12-20, 69:19-25; Pl. 56.1 ¶ 42.  On June 26, 2018, M&R and Alba executed an indemnification agreement identical to the one executed between Laboz and M&R (the "M&R-Alba Indemnification Agreement"), which indemnified M&R from any of Alba's negligent acts.  See Phelan Decl., Ex. 14 (M&R-Alba Indemnification Agreement) § 1.1; Pl. 56.1 ¶ 61.  The same day, Laboz and Alba executed an identical indemnification agreement (the "Laboz-Alba Indemnification Agreement").  Phelan Decl., Ex. 13(Laboz-Alba Indemnification Agreement) § 1.1; Pl. 56.1 ¶ 62.  As a result, Laboz was indemnified by both M&R and Alba for their respective negligent acts, and M&R was indemnified by Alba for its negligent acts.

The parties agree that in connection with apartment renovations, the Co-Op required the installation of "shutoff valves" (also called "isolation valves") on all existing water

---

[6] Like M&R, Alba provided a certificate of insurance in the amounts required by the Alteration Agreement.  See Phelan Decl., Ex. 35; Pl. 56.1 ¶ 64.

risers.  McGurl Dep. 47:13-50:14; Pl. 56.1 ¶¶ 18-19.  Until such
valves were installed, the only way to turn off an apartment's
water supply was to turn off the water for the entire building.
McGurl Dep. 137:11-25.  For this reason, it was the Co-Op's policy
<u>not</u> to shut off the building's water supply during a demolition so
as not to "disrupt everybody in the building."  <u>Id.</u> 60:24-62:5.
Consistent with this requirement, Alba was hired (at least in large
part) "to perform demolition to reveal the building riser[s] so
that the plumber could [later] come in and install the isolation
valves."  Phelan Decl., Ex. 31 ("M&R Supervisor Dep.") 47:6-13.

One water riser in particular -- the riser between the bar
and the powder room -- is at the center of the parties' dispute.
Although there is some disagreement about who requested the work
and whether it was within the scope of Alba's contract, there is
no dispute that at some point, Alba agreed "to open up the wall to
install isolation valves" on the water riser between the bar and
the powder room.[7]  <u>Id.</u> 47:19-22; Pl. 56.1 ¶ 78-81.  Indeed, Alba's

---

[7] Alba's principal Andrew Horan ("Alba's Principal") testified that the
demolition of the wall between the powder room and bar was not within the
scope of Alba's contract and was "extra work" done at the request of M&R.
Phelan Decl., Ex. 30 ("Alba's Principal Dep.") 111:16-112:8, 122:4-10.
However, the M&R Supervisor testified that this work was "[a]bsolutely"
within the scope of Alba's contract and that the only "extra work" he asked
Alba to perform was to finish and clean up the demolition of an unrelated
closet -- a request he made only <u>after</u> the relevant accident occurred.  M&R
Supervisor Dep. 47:6-13, 95:13-96:6, 190:14-23, 240:7-241:4.  Regardless,
Alba's Principal conceded that he agreed to perform demolition work on the

principal Andrew Horan ("Alba's Principal") testified that Alba planned to open the wall and "expos[e] . . . the mechanical lines at the location between the bar and the powder room."   Phelan Decl., Ex. 30 ("Alba's Principal Dep.") 211:4-11.  Likewise, Alba's foreman Raffaele Lostumbo (the "Alba Foreman") testified that he understood the plan was to "remov[e] the plaster to get a better look at what was behind the wall."   Phelan Decl., Ex. 36 ("Alba Foreman Dep.") 110:19-22.

The parties further agree that prior to the commencement of Alba's demolition work, Superintendent McGurl conducted a walkthrough of Laboz's unit with M&R's supervisor Vincent Barletta (the "M&R Supervisor") and the Alba Foreman.[8]   Pl. 56.1 ¶ 65. Superintendent McGurl testified that during the walkthrough, he pointed out the location of the building's risers and specifically warned the Alba Foreman to "be careful working on [the] wall"

---

wall in question.  Alba's Principal Dep. 111:22-112:8, 211:24-212:11; see also Phelan Decl., Ex. 36 ("Alba Foreman Dep.") 62:7-23.  Moreover, the discussion about "extra work" likely pertains to the cost of the project rather than to responsibility over the demolition work.

[8] Although Alba's Rule 56.1 counterstatement "acknowledges there was a walkthrough before work commenced," Alba 56.1 ¶ 65, the Alba Foreman denied ever doing a walkthrough with Superintendent McGurl, Alba Foreman Dep. 93:14-18.  However, he testified that on the first day of the job (the same day as the walkthrough), Superintendent McGurl "stop[ped] by" a meeting he was having with the M&R Supervisor during which they "went over the drawings, demolition drawings, and [] marked out walls."  Id. 28:18-29:4.  Therefore, all three men agree that there was some meeting -- whether it is characterized as a walkthrough or otherwise -- on the first day of the project, before the demolition work began.

between the powder room and bar "because the building riser was located [in] that wall."  McGurl Dep. 154:12-24; Pl. 56.1 ¶ 66. The M&R Supervisor confirmed this in his testimony, stating that Superintendent McGurl "[a]bsolutely" pointed out to the Alba Foreman the location of the risers and warned him to "open the walls as gently as possible."  M&R Supervisor Dep. 65:3-65:21; Pl. 56.1 ¶ 67.

Alba's demolition work began on June 26, 2018.  Pl. 56.1 ¶ 70. The Alba Foreman testified that on the morning of June 28, 2018, he instructed Alba employee Valente Oropeza ("Mr. Oropeza") "to remove the plaster and lath[]" on the wall between the powder room and the bar.[9]  Alba Foreman Dep. 109:3-6; see id. 110:5 ("I told [Mr. Oropeza] to remove the plaster first.").  The Alba Foreman further explained that Mr. Oropeza "was aware" that the building's water had not been shut off and thus the riser in the partition was "live."[10]  Id. 111:10.

---

[9] The Alba Foreman testified that Mr. Oropeza was his "best guy," Alba Foreman Dep. 62:20-23, and Alba's Principal similarly stated that Mr. Oropeza was one of Alba's "top employees," Alba's Principal Dep. 21:19-20.  However, Mr. Oropeza now lives in Mexico and has been unable to return to the United States.  Alba Foreman Dep. 105:21-106:6; Alba's Principal Dep. 20:17-20.  Per this Court's order dated March 8, 2022, because Mr. Oropeza was not produced for a deposition, he may not be called as a witness at trial.  ECF No. 40.
[10] The Alba Foreman testified that although it is "not normal practice" to do demolition work around live risers, he explained that roughly twenty percent of his jobs have required him to work with live risers.  Alba Foreman Dep. 34:9-13, 91:7-13.  According to the Alba Foreman, the only precaution to take when working around a live riser is to shut off the water.  Id. 63:16-25.

According to the Alba Foreman, Mr. Oropeza, who was working alone, was using a hammer to break away the plaster on the wall. Id. 64:25-65:7., 127:19-129:14; Pl. 56.1 ¶¶ 74, 76.  The M&R Supervisor similarly testified that Mr. Oropeza was using a hammer to open the wall but noted that he also saw crowbars in the vicinity.[11]  M&R Supervisor Dep. 264:16-265:7.  At around 11:15 a.m., about one hour into the job, when approximately half the plaster was removed, a water pipe within the partition broke and water began spewing throughout the apartment and continued for about ten minutes.  Alba Foreman Dep. 68:1-72:24, 109:25-110:12, 127:19-24; M&R Supervisor Dep. 103:20-104:2; Pl. 56.1 ¶¶ 73-75; ECF No. 125 (Alba's 56.1 Counterstatement to M&R) ¶ 13.

The Alba Foreman's daily log acknowledges that an accident occurred at around 11:15 a.m.  It states:

> We ran into a problem around 11:15am.  While removing mesh from partitioning wall between the Bar and the Powder room[,] a pipe was struck and began spilling water out onto the apartment and the floors below.  The shut off valve was in the wall and was not working.  Water went [d]own 4th floor to basement.

Phelan Decl., Ex. 18; Pl. 56.1 ¶ 73.  A report made by Superintendent McGurl on the day of the accident also notes that

---

[11] The M&R Supervisor testified that the Alba team was "using the proper tools" to remove the plaster.  M&R Supervisor Dep. 177:22-25.

"Alba Demolition was in process of demolition when an unexposed solder joint came apart on a 1/2 [inch] copper feed line in wall. Water cascaded from 4th (fourth floor) demolition down [through] [apartments] on 3rd floor, duplex Apt. 1 West, and superintendent's office."  Phelan Decl., Ex. 15; Pl. 56.1 ¶¶ 82-83.

The parties do not dispute that while Mr. Oropeza was conducting demolition work on the partition between the bar and powder room, a pipe broke and caused extensive water damage.  Pl. 56.1 ¶¶ 76-90; Alba Foreman Dep. 127:5-10; Alba's Principal Dep. 66:5-12.  However, there is considerable disagreement as to why the pipe broke.  On the one hand, Alba's Principal, the Alba Foreman, and Alba's expert all claim that the pipe broke because it was improperly soldered and thus separated once the plaster wall was "disturbed."  Declaration of William Kelly ("Kelly Decl."), ECF No. 111, Ex. O (Alba's Expert Affidavit) ¶ 17; see also Alba's Principal Dep. 112:15-22; Alba Foreman Dep. 78:17-79:11; Alba 56.1 ¶ 76-90.  The M&R Supervisor similarly testified that the pipe was improperly soldered and would not have come apart had it been soldered correctly.  M&R Supervisor Dep. 180:20-21.

On the other hand, Superintendent McGurl and each of the experts of plaintiff, Laboz, and M&R agree that although the soldering may have been defective, the leak occurred because the

pipe was directly struck during the demolition.  McGurl Dep. 97:3-15, 120:19 ("I believe [Alba] struck it.");  Phelan Decl., Ex. 24 (Plaintiff's Expert Report) at 6; id., Ex. 25 (Laboz's Expert Report) at 27;  id., Ex. 26 (M&R's Expert Report) at 8; Pl. 56.1 ¶¶ 76-90; Laboz 56.1 ¶¶ 76-90; M&R 56.1 ¶¶ 76-90.  The parties attach photographs of the pipe revealing a dimple or dent consistent with contact by a hammer or other object.  Pl. 56.1 ¶ 88.

There is no dispute, however, that after the pipe broke, the Co-Op had to hire a plumber for an emergency repair of the broken pipe and pay its workers overtime to help with the immediate aftermath of the water damage.[12]  Pl. 56.1 ¶¶ 91-92; Phelan Decl., Ex. 19.  The Haris' unit also sustained significant damage and thus the Haris submitted a claim under their insurance policy to plaintiff, which, in turn, paid them $1,277,471.25 for the losses they sustained.  Phelan Decl., Exs. 28-29; Pl. 56.1 ¶¶ 103-04.

---

[12] Laboz paid for the damage sustained by his immediate downstairs neighbor and in exchange received a release and assignment.  Phelan Decl., Ex. 22; Pl. 56.1 ¶ 96.  As the neighbor's assignee, Laboz commenced a separate action in state court against M&R and Alba.  Phelan Decl., Ex. 23; Pl. 56.1 ¶ 97.

**B.   Procedural History**

On November 2, 2020, plaintiff filed the instant action against Laboz, M&R, and Alba (collectively, "defendants"), asserting (1) a negligence claim against all defendants; and (2) a breach of contract claim against Laboz.[13]   ECF No. 1 ("Compl.") ¶¶ 21-34.   Plaintiff seeks as relief $1,287,458.03.   Id. ¶ 25.

Each defendant filed an answer and asserted crossclaims against the other co-defendants.   Laboz asserted crossclaims for (1) common law indemnification; (2) contribution; (3) contractual indemnification; and (4) breach of contract for failure to procure the requisite insurance.   ECF No. 14 ("Laboz Crossclaims") ¶¶ 58-72.   M&R asserted crossclaims for (1) common law indemnification; (2) contribution; (3) contractual indemnification; and (4) breach of contract (against Alba alone) for failure to obtain the requisite insurance.   ECF No. 21 ("M&R Crossclaim") ¶¶ 56-63.   And Alba asserted cross claims for (1) common law indemnification; (2) contribution; and (3) contractual indemnification.   ECF No. 12 ("Alba Crossclaims") ¶¶ 46-50.

---

[13] Plaintiff initially sued both Alba Services, Inc. (referred to here as "Alba") and Alba Carting & Demolition, Inc.  Compl. ¶ 5.  However, the parties stipulated to the voluntary dismissal of Alba Carting & Demolition, Inc., which the Court so-ordered on July 13, 2023.  ECF No. 124.

The parties undertook a lengthy discovery process that concluded in April 2022.  See ECF No. 51.  Thereafter, there were several conferences with the Court to address possible settlement as well as multiple failed attempts at mediation.  The parties subsequently filed a slew of pre-motion letters regarding their anticipated motions for summary judgment.  See ECF Nos. 48-49, 55-56, 59-64.  On April 28, 2023, the Court issued an order stating that it "has no objection" to the filing of three proposed motions for summary judgment: (1) plaintiff's motion against Laboz; (2) Laboz's motion against M&R and Alba; and (3) M&R's motion against Alba.  ECF No. 74.  These motions, including Laboz's cross motion against plaintiff, were fully briefed on July 20, 2023.[14]  See ECF Nos. 81-134.

---

[14] In addition to these motions, which were authorized by the Court, Alba filed a "cross-motion" for summary judgment on plaintiff's breach of contract claim asserted against Laboz.  See ECF Nos. 100-101.  Moreover, as part of its reply brief in support of its motion for summary judgment against Laboz, plaintiff filed a "cross-motion to amend [its] complaint."  ECF Nos. 132-34.  As the Court has already explained to the parties, its Individual Practice 2B requires that counsel who wish to make a motion describe that motion in a three-page letter before filing the motion.  See ECF No. 58 (explaining Individual Practice 2B).  Although these additional motions were filed in violation of our Individual Practice Rule, they will be addressed on the merits herein.  However, no further violations will be tolerated.

-14-

**DISCUSSION**

**A. Legal Standards**

Summary judgment is properly granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 113-14 (2d Cir. 2017) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The movant "always bears the initial responsibility of informing the district court of the basis for its motion," as well as the basis for any absence of material fact in dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant must satisfy this burden by pointing to the absence of evidence to support an essential element of the nonmoving party's claim." Gummo v. Vill. of Depew, N.Y., 75 F.3d 98, 107 (2d Cir. 1996). Courts must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." Gilman v. Marsh & McLennan Cos., Inc., 826 F.3d 69, 73 (2d Cir. 2016).

If the moving party makes a showing that it is entitled to summary judgment, "[t]hen the onus shifts to the party resisting summary judgment to present evidence sufficient to satisfy every element of the claim." Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008). The non-moving party "may not merely rest on the allegations or denials of his pleading; rather his response . . . must set forth 'specific facts' demonstrating there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). A "scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252. "If no rational fact finder could find in the non-movant's favor, there is no genuine issue of material fact, and summary judgment is appropriate." Citizens Bank of Clearwater v. Hunt, 927 F.2d 707, 710 (2d Cir. 1991).

Where, as here, "cross motions for summary judgment are made, the standard is the same as that for individual motions." United Indus. Corp. v. IFTE plc, 293 F. Supp. 2d 296, 299 (S.D.N.Y. 2003). "The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." Id.

-16-

**B. Plaintiff's Motion Against Laboz and Laboz's Cross-Motion**

Plaintiff filed a motion for summary judgment on its breach of contract claim against Laboz.  Laboz opposed that motion and filed a cross-motion for summary judgment seeking dismissal of both the breach of contract and negligence claims that plaintiff asserted against him.  We will address each claim in turn.

**1. Breach of Contract**

The doctrine of equitable subrogation allows plaintiff to "stand in the shoes" of the Haris and "pursu[e] any claims that the [Haris] may have had against parties legally responsible for the loss."  Allstate Ins. Co. v. Mazzola, 175 F.3d 255, 258 (2d Cir. 1999).  Invoking this doctrine and thus standing in the shoes of the Haris, plaintiff asserts a breach of contract claim against Laboz.  To assess this claim, we must briefly revisit plaintiff's complaint.  In it, plaintiff alleges the existence and breach of only one agreement: the Alteration Agreement between Laboz and the Co-Op.  Compl. ¶¶ 27-34.  Plaintiff argues that even though the Haris were not party to the Alteration Agreement, they nonetheless have a right to sue under the Agreement as third-party

-17-

beneficiaries.  ECF No. 84 ("Mot.") ¶ 17.[15]  This argument lacks merit.

A party asserting rights as a third-party beneficiary must establish that "the contract was intended for his benefit" and that "the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost."  Madeira v. Affordable Hous. Found., Inc., 469 F.3d 219, 251 (2d Cir. 2006).  Here, the Alteration Agreement makes abundantly clear that it is not intended to benefit any third parties.  Indeed, the Agreement contains a "negating clause," titled "No Third Party Beneficiaries," that provides that "[n]o person or entity not a party to this Agreement, including any other shareholder in the Corporation shall be deemed a third-party beneficiary hereunder."  Alteration Agreement § 45 (emphasis added).  "Under New York law, the effectiveness of a negating clause to preclude third-party beneficiary status is well-established: where a provision exists in an agreement expressly negating an intent to permit enforcement by third parties, . . . that provision is decisive."  India.Com, Inc. v. Dalal, 412 F.3d 315, 321 (2d Cir. 2005) (internal

---

[15] Plaintiff's memorandum of law does not contain page numbers but instead sets forth its argument in paragraph form.

-18-

quotations omitted) (citing cases). Plaintiff points to numerous other provisions in the Alteration Agreement that seemingly confer benefits on shareholders like the Haris, but these references "d[o] not overcome 'the explicit negation of third-party beneficiary obligations' found elsewhere in the [Agreement]." Id. (quoting Morse/Diesel, Inc. v. Trinity Indus., Inc., 859 F.2d 242, 249 (2d Cir. 1988)). Therefore, the Haris are not intended third-party beneficiaries of the Alteration Agreement, and plaintiff's breach of contract claim fails.

Despite only alleging a breach of the Alteration Agreement in its complaint, plaintiff contends in its memorandum of law that Laboz breached several additional agreements: (1) the Proprietary Lease; (2) the "Important Notice Regarding Apartment Alterations"; and (3) Exhibit D to the Alteration Agreement. Mot. ¶ 8. Apparently recognizing "the well-settled rule that a party is bound by what it states in its pleadings," Town & Country Linen Corp. v. Ingenious Designs LLC, 18 Civ. 5075 (LJL), 2022 WL 1515120, at *10 n.6 (S.D.N.Y. May 13, 2022), plaintiff seeks leave to amend its complaint to include allegations about these additional agreements, see ECF No. 133-1 ("Proposed Am. Compl."). Regardless

of whether that motion is unduly delayed,[16] it fails because amendment would be futile: none of the additional agreements could supply the basis of a breach of contract claim.  See Kim v. Kimm, 884 F.3d 98, 105-06 (2d Cir. 2018); Fed. R. Civ. P. 15(a).

First, like the Alteration Agreement, the Proprietary Lease was executed only between Laboz and the Co-Op, and nothing in it suggests an intent to benefit third parties.  See Phelan Decl., Ex. 5 (Proprietary Lease).  To the contrary, the Lease specifies that the covenants in the lease "[a]pply" only to Laboz and his "executors, administrators, legal representatives, legatees, distributes, and assigns."  Id. at Art. V, ¶ 2.  Elsewhere, the Lease provides that any damage caused by Laboz gives the Co-Op, and only the Co-Op, the right to collect costs of repair from Laboz.  Id. at Art. II, ¶ 7.  Consistent with New York law, the Proprietary Lease makes clear that it is not intended to benefit other shareholders like the Haris.  See, e.g., O'Hara v. Bd. of Dirs. of Park Avenue & Seventy-Seventh St. Corp., 171 N.Y.S.3d 3, 5 (App. Div. 2022) ("The cause of action for breach of contract against the [defendants] was correctly dismissed, since there is nothing in the . . . proprietary lease that indicates that

---

[16] Plaintiff filed its complaint in November 2020 and despite years of discovery and the filing of numerous summary judgment motions, plaintiff did not seek leave to amend until July 2023.  ECF Nos. 1, 132.

plaintiffs [other shareholders] were intended third-party beneficiaries of the lease."). Therefore, any contract claim based on the Proprietary Lease would fail and thus amendment on these grounds is futile.

Second, plaintiff's reliance on the "Important Notice to all Shareholders" is misplaced. Mot. ¶¶ 22-23. As the name suggests, this is merely a notice, not an agreement, that was provided to all shareholders and outlines the Co-Op's processes, procedures, rules, and requirements concerning alterations of units. Phelan Decl., Ex. 8 at 4. The notice neither confers rights to other shareholders like the Haris nor imposes obligations on Laboz that are enforceable in contract or otherwise. Therefore, amendment on these grounds is similarly futile.

Third, plaintiff argues that Laboz breached Exhibit D to the Alteration Agreement. Mot. ¶ 32. The Alteration Agreement required Laboz to deliver Exhibit D "to each of the shareholders or occupants of the apartments that are adjacent to and immediately above and below" Laboz's unit. Alteration Agreement § 5 (emphasis added). But as plaintiff acknowledges, "the Haris are two units below Laboz," not immediately below, and thus even if Exhibit D confers enforceable rights to other shareholders, those rights do

not extend to the Haris.  Mot. ¶ 35.  Accordingly, amendment on these grounds, like those above, would be futile.

For these reasons, we deny plaintiff's motion for summary judgment on its breach of contract claim and grant Laboz's cross-motion on the same claim.  We further deny plaintiff's motion for leave to amend the complaint because any amendment would be futile.[17]

## 2. Negligence

We now consider Laboz's cross-motion for summary judgment on the negligence claim that plaintiff asserts against him.  To begin, there is no suggestion that Laboz himself performed, directed, supervised, or controlled any part of Alba's demolition work.  Rather, Laboz merely retained a general contractor, M&R, who, in turn, retained a subcontractor, Alba, to perform demolition work.[18]

---

[17] The other major amendment plaintiff seeks to make is to add a nuisance claim against defendants.  See Proposed Am. Compl. ¶¶ 38-41.  This amendment, however, would be as futile as the other proposed amendments because any nuisance claim would be duplicative of plaintiff's negligence claim and thus subject to dismissal.  See, e.g., Yu Zing Zhi v. J-Mart Grp., Inc., 138 N.Y.S.3d 181, 184 (App. Div. 2020) (holding that trial court should have granted summary judgment dismissing plaintiff's nuisance claim because it was "duplicative of her first cause of action, alleging negligence"); Trulio v. Vill. of Ossining, 59 N.Y.S.3d 449, 452 (App. Div. 2017) (finding summary judgment was appropriate where nuisance claim was "predicated on negligence" and thus "duplicative" of the negligence claim).

[18] To the extent any party claims that Laboz was negligent for hiring M&R, this claim would fail because there was no indication that M&R had a "propensity for the conduct which caused the injury."  Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004).  In fact, Laboz testified that he

-22-

In New York, "[t]he general rule is that a party who retains an independent contractor, as distinguished from a mere employee or servant, is not liable for the independent contractor's negligent acts." Kleeman v. Rheingold, 81 N.Y.2d 270, 273-74 (1993). However, plaintiff contends that one of the exceptions to this general rule -- "the exception for nondelegable duties" -- applies here, making Laboz liable for the purported negligence of his independent contractor. See ECF No. 134 ("Reply") ¶ 42. We disagree.

As an initial matter, "[t]here are no clearly defined criteria for identifying duties that are nondelegable." Kleeman, 81 N.Y.2d at 275. "Indeed, whether a particular duty is properly categorized as 'nondelegable' necessarily entails a sui generis inquiry, since the conclusion ultimately rests on policy considerations." Id. With this in mind, plaintiff points to two different sources that supposedly impose nondelegable duties on Laboz. First, plaintiff claims that the "Propriety Lease/Alteration Agreement contained certain non-delegable duties that Laboz owed to his fellow shareholders." Reply ¶ 43. However, plaintiff makes no effort to explain what exactly these alleged duties are. In any event, the

---

retained M&R specifically because he had worked with them in the past and did so without issue. Laboz Dep. 15:2-17:21.

New York Court of Appeals has expressly rejected a nearly identical argument, reasoning that "a contractual obligation, standing alone, will . . . not give rise to tort liability in favor of a third party absent certain exceptions not applicable here." Brothers v. N.Y. State Elec. & Gas Corp., 11 N.Y.3d 251, 259 (2008) (internal quotations omitted).  In other words, plaintiff cannot end run the clear deficiencies of its contract claim by basing its negligence claim on those very same contracts that were not intended to benefit third parties like the Haris.

Second, plaintiff claims that Chapter 33 of the 2014 New York City Building Code (the "Building Code"), which sets forth the requisite safeguards during construction and demolition, imposes a nondelegable duty on Laboz.  Reply ¶¶ 46-48.  Although a nondelegable duty can be imposed "by regulation or statute," Kleeman, 81 N.Y.2d at 275, the prefatory section of Chapter 33 provides that "[c]ontractors, construction managers, and subcontractors engaged in construction or demolition operations shall institute and maintain all safety measures required by this chapter."  Building Code § 3301.2 (emphasis added).  By its own terms, the duties imposed in Chapter 33 apply only to the parties engaging in the demolition work; they do not extend to the owners

or lessors of the buildings where the work is being done.[19]  As such, the Building Code does not impose a non-delegable duty on Laboz.

Accordingly, the general rule shielding owners from the negligent acts of their independent contractors applies to and protects Laboz from liability.  For these reasons, no reasonable jury could find Laboz negligent on these facts, and thus we grant Laboz's cross-motion for summary judgment dismissing the negligence claim that plaintiff asserts against him.  To be clear, however, plaintiff's negligence claims against both M&R and Laboz remain intact.

## C. Laboz's Motion Against Alba and M&R

Laboz seeks summary judgment on his contractual and common law indemnification crossclaims against Alba and M&R.  ECF Nos. 94-99.  "Under well-settled New York law, a party may be bound to indemnify another either by contract or by implication, under

---

[19] To be sure, other provisions in Chapter 33 of the Building Code impose duties on "the person causing" the demolition or construction.  See, e.g., Building Code § 3309.8.  "Under New York law, it is well established that the words 'person or persons causing' apply to the owner of the property who employs a third person to conduct a construction project."  USAA Cas. Ins. v. Permanent Mission of Republic of Namibia, 681 F.3d 103, 109 (2d Cir. 2012) (cleaned up).  However, the only provision on which plaintiff relies -- section 3303.2.1 -- does not contain such language and thus does not impose duties on owners like Laboz.

common law." <u>Allianz Glob. Corporate & Specialty, N.A. v. Sacks</u>, Nos. 08 Civ. 563 (LTS) & 08 Civ. 8902 (LTS), 2010 WL 3733915, at *5 (S.D.N.Y. Sept. 23, 2010). Here, Laboz is entitled to contractual indemnification from both Alba and M&R, and so we need not address his common law indemnification claim. However, because the analyses differ in some key respects across the two contractors, we will first address the motion against Alba before turning to the motion against M&R.

### 1. Alba

"A party is entitled to full contractual indemnification provided that the intention to indemnify can be clearly implied from the language and purposes of the entire agreement and the surrounding facts and circumstances." <u>Drzewinski v. Atl. Scaffold & Ladder Co.</u>, 70 N.Y.2d 774, 777 (1987) (internal quotations omitted). "Under New York law, a party cannot receive contractual indemnification from its own negligence." <u>Lewis v. Lendlease (US) Const. LMB Inc.</u>, 18 Civ. 8662 (LJL), 2022 WL 1304801, at *5 (S.D.N.Y. May 2, 2022). "Thus, a party seeking contractual indemnification must prove itself free from negligence, because to the extent its negligence contributed to the accident, it cannot be indemnified therefor." <u>Id.</u> (internal quotations omitted).

These requirements are easily satisfied here.  First, the intention to indemnify is clear on the face of the indemnification agreement between Laboz and Alba, which provides:

> To the fullest extent permitted by law, the contractor [Alba] shall indemnify, defend, and hold harmless the Owner [Laboz] . . . provided that [any] claim, damage, loss or expense is . . . cause[d] in whole or in part by negligent acts or omissions of the contractor . . . , regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder."

Laboz-Alba Indemnification Agreement § 1.1.[20]  As such, there can be no dispute based on the plain language of the agreement that Alba intended to indemnify Laboz from any negligent acts on its part.  Indeed, even Alba's Principal testified that the identical indemnification agreement executed between Alba and M&R is "quite clear" and "self-explanatory."  Alba's Principal Dep. 95:13-19.  Second, Laboz does not impermissibly seek indemnification from his own negligence.  To the contrary, as discussed above, there is no

---

[20] There is no suggestion that this indemnification agreement violates New York law and nor could there be.  The agreement contains a savings clause ("to the fullest extent permitted by law") that is consistent with the dictates set forth by New York's Court of Appeals in Brooks v. Judlau Contr., Inc., 11 N.Y.3d 204, 210 (2008).  Moreover, the agreement does not impermissibly indemnify Laboz from his own negligence by, for example, shielding him from liability for damage he caused in full.  Rather, the agreement only indemnifies Laboz for damage he "caused in part," which has repeatedly been found to be permissible under New York law.  See, e.g., Johnson v. Chelsea Grand E., LLC, 2 N.Y.S.3d 446, 446 (App. Div. 2015) (holding the indemnification agreement was permissible under New York law because "it is limited by the phrases, '[t]o the fullest extent permitted by law,' and 'regardless of whether or not such claim, damage, loss or expense is caused in part by [the indemnitee].'" (emphasis in original)).

suggestion that Laboz himself performed, directed, supervised, or controlled any part of Alba's demolition work.  Accordingly, Laboz is clearly "free from negligence" relating to the accident.  <u>Lewis</u>, 2022 WL 1304801, at *5.  As such, Alba is contractually obligated to indemnify Laboz for its negligent acts.

To resist this conclusion, Alba argues that the indemnification agreement has not yet been triggered because the question of whether Alba was negligent remains in dispute.  ECF No. 110 ("Opp.") at 20.  This argument is unpersuasive.  By way of reminder, Alba agreed to indemnify Laboz for any damage "cause[d] in whole <u>or in part</u>" by Alba's own negligent acts.  Laboz-Alba Indemnification Agreement § 1.1 (emphasis added).  Thus, if Alba was even <u>partially</u> negligent, the indemnification agreement is triggered, and Alba must indemnify Laboz for its negligent acts.  Although it is premature to conclude Alba is fully negligent for breaking the pipe, as the discussion below will demonstrate, no reasonable jury could conclude that Alba was completely free from negligence.  In other words, there can be no dispute that Alba was -- at the very least -- partially negligent in causing the pipe to break, which is sufficient to trigger the indemnification agreement.

Alba contends that it was not negligent because the pipe broke as a result of improper soldering rather than its demolition work. Opp. at 25.   Indeed, Alba's expert concludes in his report that had the pipe been installed and soldered correctly, it would not have separated when Alba was demolishing the wall.   Alba's Expert Report ¶¶ 17-18.[21]   But even if this contention is true, it does not get Alba very far.   In New York, to establish that a defendant was the proximate cause of the injury, a plaintiff "need not positively exclude every other possible cause of the accident." Gayle v. City of New York, 92 N.Y.2d 936, 937 (1998).   Rather, a plaintiff "need only prove that it was 'more likely' or 'more reasonable' that the alleged injury was caused by the defendant's negligence than by some other [cause]."   Id. (internal citations omitted).   Here, whether or not the pipe was improperly soldered, as Alba claims, the evidence overwhelmingly demonstrates that Alba's negligence was the "more likely" (and thus proximate) cause of the broken pipe.

Before the demolition began, Superintendent McGurl pointed out the location of the riser in the wall between the bar and powder room to the Alba Foreman and M&R Supervisor and directed

---

[21] Although we cite the parties' expert reports here, the Court anticipates that there may well be Daubert motions addressed to those reports.

them to "be careful as you're opening up around water lines" and to "open the walls as gently as possible.  Don't go in with a sledgehammer." M&R Supervisor Dep. 64:18-66:25; see also id. 78:7-13 ("He . . . explained that there was plumbing in the [] wall."). In fact, both the M&R Supervisor and Superintendent McGurl agreed that piping was "clearly visible stubbed out of [the] wall" between the bar and powder room.  Id. 149:16-18; McGurl Dep. 186:13-18.

For his part, the Alba Foreman testified that he not only knew that there was a pipe in the wall, but also that the "riser [was] live."[22] Alba Foreman Dep. 60:3.  He explained that although about "[t]wenty percent of [his] jobs" have required demolition work around live plumbing risers, id. 91:11-13, it is "dangerous" and "very sensitive" work, id. 63:12-15.  For this reason, the Alba Foreman explained, the plan was not to fully demolish the wall but simply to "remov[e] the plaster to get a better look at what was behind the wall." Id. 110:19-22.  As such, on the morning of the accident, the Alba Foreman specifically "instructed" Mr. Oropeza, who was likewise "aware" that the water pipes were live, "to remove the plaster and lath[]" on the wall between the bar and

---

[22] Alba's Principal confirmed in his testimony that he was similarly aware the piping in the wall was live.  Alba Principal Dep. 111:9-112:14, 198:12-20.

powder room.[23]   Id. 109:3-6, 111:10.   Working alone and without supervision, Mr. Oropeza commenced the demolition using a hammer, and about an hour later, the water pipe broke.   Id. 64:25-67:17, 109:25-110:12, 127:19-128:5.   Moreover, there is no suggestion by any party that any individual other than Mr. Oropeza made physical contact with the wall.

The vast majority of potential witnesses and experts believe that Alba (and specifically Mr. Oropeza) struck the pipe and caused the leak.   See McGurl Dep. 97:3-15, 120:19 ("I believe [Alba] struck it."); Plaintiff's Expert Report at 6 (concluding "within a reasonable degree of engineering certainty" that "Alba . . . struck the piping causing the piping in the wall to separate."); Laboz's Expert Report at 27 ("Impact causing the failure of the subject pipe connection from demolition performed by Alba Services could not be ruled out based on marking from the pipe."); M&R's

---

[23] The Alba Foreman testified that he was instructed by Alba's Principal to "give" the M&R Supervisor "a guy" to do the demolition work on the partition between the bar and the powder room.  Alba Foreman Dep. 62:17-19.  To the extent that Alba contends that this somehow shifted supervisory responsibility from Alba to M&R, that argument is unpersuasive.  First, the M&R Supervisor denies ever asking to "borrow" any Alba employees.  M&R Supervisor Dep. 94:17-95:3, 239:20-240:3.  Second, it was Alba that was ultimately responsible for overseeing all demolition work relating to the renovation project.  Third, and most importantly, the Alba Foreman himself testified that he was the one who specifically instructed Mr. Oropeza "to remove the plaster and lath[]" on the morning of the accident, undermining any inference that M&R acquired supervisory responsibility over Mr. Oropeza. Alba Foreman Dep. 109:4-6; see also id. 58:16-18 (stating that he "direct[ed] [Mr.] Oropeza to perform specific work that day").

Expert Report at 8 ("The piping system was struck during demolition by Alba.").[24]   In fact, Alba's <u>own contemporaneous report</u> states that "[w]hile removing mesh from partitioning wall between the Bar and the Powder room[,] <u>a pipe was struck and began spilling water</u>." Ex. 18 (emphasis added).   The M&R Supervisor testified that Alba's contemporaneous report "would be a fair and accurate representation of how the accident occurred" and that he would have "no reason to doubt the accuracy of [that] report."   M&R Supervisor Dep. 272:7-273:15.

Based on this evidence, no reasonable jury could find Alba completely free from negligence.   Even if the pipe was improperly soldered, it had been working without issue for about fifty years before Alba began its demolition work.   McGurl Dep. 142:2-11.   At bottom, Alba knew there was a pipe in the wall; Alba knew the pipe was live; and, most importantly, Alba was the party wielding the hammer when the pipe broke.   Therefore, because Alba was at the very least partially negligent in causing the pipe to break, Laboz's indemnification agreement with Alba is triggered and

---

[24] Alba's own expert acknowledges in his report that the pipe was dented. Alba's Expert Report ¶¶ 19-21.   However, he asserts that "it cannot be confirmed whether the observed dent resulted from the demolition proceedings at the time of the reported incident, or whether it was the result of post-incident extraction."   <u>Id.</u> ¶ 19.

summary judgment on his contractual indemnification agreement is granted.

## 2. M&R

We now turn to Laboz's motion seeking contractual and common law indemnification from M&R.  As discussed above, Laboz and M&R executed the same indemnification agreement as between Laboz and Alba.  See Laboz-M&R Indemnification Agreement § 1.1.  M&R argues that it was not itself negligent and that it cannot be held responsible for the "independent negligent acts of Alba."  ECF No. 103 ("Opp.") at 4.  However, M&R agreed to indemnify Laboz from any damage caused by the negligent acts of M&R itself "or [of its] Sub-contractors," which includes Alba.  Laboz-M&R Indemnification Agreement § 1.1.  Thus, even if M&R is not responsible for Alba's negligent acts, the indemnification agreement is still triggered by a showing that Alba was negligent.  Here, M&R cannot dispute that Alba was at least partially negligent given its argument, including in its own motion discussed below, that Alba was negligent.  Therefore, we grant Laboz's motion for summary judgment on his contractual indemnification claim against M&R.

**D. M&R's Motion Against Alba**

Finally, M&R seeks partial summary judgment on its crossclaim for contractual indemnification against Alba.  ECF Nos. 86-90. M&R and Alba executed the same indemnification agreement as Laboz did with both parties.  M&R-Alba Indemnification Agreement § 1.1. As discussed above, this agreement is valid and demonstrates a clear intent on Alba's part to indemnify M&R from any of Alba's negligent acts.  Although M&R cannot be indemnified from its own negligence, New York's Court of Appeals has embraced the concept of partial indemnification.  See Brooks v. Judlau Cont., Inc., 11 N.Y.3d 204, 207 (2008).  That is, a general contractor "who has been found to be partially at fault [may] enforce an indemnification provision against its subcontractor for that portion of damages attributable to the negligence of the subcontractor."  Id.  Accordingly, New York courts have granted conditional summary judgment on general contractors' contractual indemnification claims pending an ultimate determination on the extent of each party's negligence.  See, e.g., Cuomo v. 53rd & 2nd Assoc., LLC, 975 N.Y.S.2d 53, 53 (App. Div. 2013) (citing cases).[25]

---

[25] Alba cites numerous cases for the proposition that the indemnification agreement was not triggered because there has been no negligence determination, but these cases either predate the Court of Appeals' decision in Brooks or do not address conditional summary judgment.

Here, at this stage, we cannot say that M&R is free from all negligence. Thus, although we conclude that M&R is contractually indemnified from any of Alba's negligent acts, the extent to which M&R is entitled to indemnification depends on the extent to which Alba's negligence is determined to have contributed to the accident. Therefore, we grant conditional summary judgment on M&R's claim for contractual indemnification against M&R.

## CONCLUSION

For the foregoing reasons, the Court (1) denies plaintiff's motion for summary judgment against Laboz; (2) grants Laboz's cross-motion for summary judgment against plaintiff; (3) grants Laboz's motion for summary judgment against both Alba and M&R; and (4) grants M&R's motion for conditional summary judgment against Alba.[26] The Court respectfully directs the Clerk of Court to terminate the motions pending at ECF Nos. 80, 81, 86, 94, 100, 116, and 132.

---

[26] The Court disregards Alba's "cross-motion" for summary judgment seeking to dismiss the breach of contract claim that plaintiff filed against Laboz because Alba was not named as a defendant for that claim. As such, Alba had no standing to bring a "cross-motion" seeking to dismiss that claim. In any event, the Court granted Laboz's cross-motion seeking dismissal of the same claim.

**SO ORDERED.**

Dated:     New York, New York
           February 20, 2024

                                        _____
                                          NAOMI REICE BUCHWALD
                                        UNITED STATES DISTRICT JUDGE